# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **THE POLICE ASSOCIATION OF NEW ORLEANS, ET AL.,**     **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO.  21-1490** |
| **CITY OF NEW ORLEANS, ET AL.,**     **Defendants** | **SECTION: "E" (2)** |

## ORDER AND REASONS

Before the Court is a motion to remand[1] filed by Plaintiffs Police Association of New Orleans ("PANO"), Michael Glasser, Andrew Weiderman, Paul Johnson, and Beth Reniff (collectively, "Plaintiffs"). Defendant the City of New Orleans (the "City") has filed an opposition.[2] For the following reasons, Plaintiffs' motion to remand is **DENIED**.

## BACKGROUND

In May 2010, the United States Department of Justice notified the City it was initiating an investigation into the New Orleans Police Department ("NOPD") for an alleged pattern or practice of unlawful misconduct, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (recodified at 34 U.S.C. § 12601); the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d; and Title VI of the Civil Rights Act of 1964, as amended, 42

---

[1] R. Doc. 15.

[2] R. Doc. 16. Defendant the New Orleans Civil Service Commission has not been served, and no waiver of service was filed in the record of the state court before removal. As a result, consent of the Civil Service Commission was not required for removal. 28 U.S.C. § 1446(b)(2)(A); *see also Johnson v. Blann Tractor Co.*, No. 07-1009, 2007 WL 2403267, at *1 (E.D. La. Aug. 16, 2007) (citing *Jones v. Houston Indep. School Dist.*, 979 F.2d 1004, 1007 (5th Cir.1992)).

U.S.C. § 2000d.[3] On July 24, 2012, the Department of Justice and the City jointly moved for this Court to enter a negotiated Consent Decree.[4] Before the Court approved the Consent Decree, Plaintiffs PANO and Glasser attempted to intervene to defend NOPD officers' property interests in their employment as protected by Louisiana's civil service laws.[5] The Court denied the motion to intervene but recognized that the then-proposed Consent Decree may make changes to the NOPD promotion procedure.[6] The Court stated that "if the proposed Consent Decree is approved, the Court will consider renewed motions to intervene by . . . PANO . . . and Glasser during the implementation phase of the Consent Decree if the United States, the City and/or NOPD seek to make changes which may implicate the Civil Service or other legally protected rights afforded to members of . . . PANO."[7] PANO and Glasser have not sought to intervene to protect their civil service property interests.[8]

This Court approved the Consent Decree on January 11, 2013.[9] For the convenience of the public and the parties, on October 2, 2018, the Court ordered an Amended and Restated Consent Decree be entered onto the record to reflect various amendments to the Consent Decree since its entry in 2013.[10] In the Consent Decree, the Court specifically "retain[ed] jurisdiction over this matter, including but not limited to the right to interpret,

---

[3] *United States v. City of New Orleans*, No. 12-1924, R. Doc. 1-1 (E.D. La. July 24, 2012) (Report of the Department of Justice); *see also* No. 12-1924, R. Doc. 565 at 6-7 (recounting the background of the Consent Decree).

[4] No. 12-1924 at R. Doc. 2.

[5] *Id.,* R. Doc. 13 at 5.

[6] *Id.,* R. Doc. 102 at 18, 25.

[7] *Id.* at 24.

[8] PANO and Glasser did file a motion for relief from the Order denying their motion to intervene; however, this motion was not a renewed motion to intervene to protect NOPD officers' civil service property interests but was based on alleged misconduct by the Assistant U.S. Attorney involved in the case. No. 12-1924, R. Doc. 165. The Court denied that motion. No. 12-1924, R. Doc. 260.

[9] No. 12-1924 at R. Doc. 159.

[10] *Id.* at R. Doc. 564. The Amended and Restated Consent Decree is on the record of Case No. 12-1924 at R. Doc. 565.

amend and enforce the Consent Decree . . . until the final remedy contemplated by the Consent Decree has been achieved."[11]

The purpose of the Consent Decree is to "to protect the constitutional rights of all members of the community, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department."[12] To achieve this goal, the Consent Decree requires NOPD to "fundamentally change the way it polices throughout the New Orleans Community."[13] Specifically, it requires "the City and the Department to implement new policies, training, and practices throughout the Department, including in the areas of: use of force; stops, searches, seizures, and arrests; photographic lineups; custodial interrogations; discriminatory policing; community engagement; recruitment; training; *performance evaluations*; *promotions*; officer assistance and support; supervision; secondary employment; and misconduct-complaint intake, investigation, and adjudication."[14] The Consent Decree requires that NOPD's "policies and procedures shall define terms clearly, comply with applicable law and the requirements of this Agreement, and comport with best practices."[15] In particular, under the Consent Decree, NOPD must "incorporate requirements regarding bias-free policing and equal protection into its hiring, *promotions*, and *performance assessment processes*, including giving *significant weight to an individual's history of sustained bias-related violations, as well as using interviews and other methods* to assess the individual's ability to effectively practice bias-free policing."[16]

---

[11] *Id.*, R. Doc. 159 at 8 (order approving Consent Decree); *see also* No. 12-1924 at R. Doc. 565, ¶¶ 485-90 (relevant Consent Decree provisions).
[12] *Id.,* R. Doc. 565 at 6.
[13] *Id.*
[14] *Id.* (emphasis added).
[15] *Id.* at ¶ 16.
[16] *Id.* at ¶ 182 (emphasis added).

In Section XIV of the Consent Decree, Performance Evaluations and Promotions, the parties agreed they should ensure officers who police effectively and ethically are recognized through the performance evaluation process and that these officers are identified and receive appropriate consideration for promotion.[17] NOPD's performance evaluations and promotion practices appear in paragraphs 295-305 of the Consent Decree.[18] In order to ensure the promotion of officers who are ethical and effective, NOPD and the City agreed to develop a more holistic model for NOPD promotions that considers a variety of factors, including number of complaints and disciplinary history.[19] NOPD was required to obtain approval from both the Department of Justice and the Office of the Consent Decree Monitor for its new promotion policy related to the Consent Decree.[20] In its 2020 report on NOPD's progress in implementing the Consent Decree, the Office of the Consent Decree Monitor noted that full implementation of the new promotions process was one of the "tasks that are standing in the way of the NOPD achieving full and effective compliance with the Consent Decree."[21]

On August 12, 2020, the New Orleans Chief Administration Office issued a citywide Policy Memorandum No. 143(R), which applies to "promotions for vacancies in commissioned classifications," including NOPD officers.[22] As part of this new promotion procedure, a Promotion Committee in applicable departments must "conduct a holistic review" of applicants based on performance evaluations, disciplinary history, and job history.[23]  This evaluation is given equal weight to the applicant's performance on a civil

---

[17] *Id.,* R. Doc. 565 at 75.
[18] *Id.*, R. Doc. 565, ¶¶ 295-305.
[19] *Id.*
[20] *Id.* at ¶ 23.
[21] *Id.*, R. Doc. 613-1 at 40.
[22] New Orleans, La., Chief Administration Office, Policy Memorandum No. 143(R) (Aug. 12, 2020). Plaintiffs provided a copy of Policy Memorandum No. 143(R) as an exhibit to their petition. This copy is on the record at R. Doc. 1-2 at 10-13.
[23] R. Doc. 1-2 at 11.

service exam.[24] The applicant with the highest combined score is given the promotion.[25] Policy Memorandum No. 143(R) allows NOPD to "establish department policies to address department-specific needs."[26]

NOPD included its revised promotions and promotions committee policy in Chapter 34.2 of the NOPD Operations Manual, attached hereto as Attachment A.[27] The revised policy was approved by the Office of the Consent Decree Monitor on May 4, 2021, and went into effect on May 23, 2021.[28] Chapter 34.2 lays out how Promotion Committee members are selected and the specific factors they may consider in evaluating promotion candidates.[29] Chapter 34.2 was followed by NOPD in July 2021 by NOPD when determining promotions to the position of police sergeant.[30]

On July 28, 2021, Plaintiffs filed a petition in Orleans Parish Civil District Court against the City of New Orleans and the New Orleans City Civil Service Commission.[31] Plaintiff PANO is a non-profit corporation whose purpose is to advocate for the rights of its members, who are police officers.[32] Plaintiff Glasser is a police officer and president of PANO.[33] Plaintiffs Weiderman, Jones, and Reniff all are police officers who allege their

---

[24] *Id.* at 12-13.
[25] *Id.* at 12.
[26] *Id.* at 10.
[27] New Orleans Police Department Operations Manual ch. 34.2 (as revised May 23, 2021), *reproduced in* Attachment A.
[28] Letter from David L. Douglas, Office of the Consent Decree Monitor, to Otha Sandifer, Deputy Superintendent, New Orleans Police Department Compliance Bureau (May 4, 2021), *reproduced in* Attachment B; New Orleans Police Department Operations Manual, *supra* note 27, ch. 34.2.
[29] New Orleans Police Department Operations Manual, *supra* note 27, ch. 34.2. The factors the Promotion Committee may consider are: effective use of community-policing strategies; number of sustained and non-sustained complaints; number and circumstances of uses of force, including any found to be out of policy and use of force complaints; disciplinary history; problem-solving skills; interpersonal skills; education; specialized training; support for departmental integrity measures; attendance record for the past two years, including leave balances; and annual performance evaluations for the previous two years. Any additional factors the Committee wishes to consider must be published in writing at least thirty days prior to the commencement if the evaluation process.
[30] R. Doc. 1 at ¶ 4.
[31] R. Doc. 1-2.
[32] *Id.* at ¶ 1.
[33] *Id.*

total scores for promotion to police sergeant were lower under the revised version of Chapter 34.2 than they would have been before.[34] Plaintiffs seek a preliminary and permanent injunction preventing Defendants from making promotions based on Policy Memorandum No. 143(R).[35]

The City removed this action to this Court on August 6, 2021.[36] Plaintiffs filed a motion to remand, arguing there is no federal question jurisdiction because their state-court petition does not mention the Consent Decree or allege that its terms violate Plaintiffs' rights.[37] Instead, Plaintiffs argue, their petition raises only questions of state law and should remain in state court.[38]

## LAW AND ANALYSIS

Federal courts are courts of limited jurisdiction and possess only the authority conferred upon them by the U.S. Constitution or by Congress.[39] Federal law allows for state civil suits to be removed to federal courts in certain instances. Generally, removal jurisdiction is governed by 28 U.S.C. § 1441(a), which provides:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

"The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper."[40]

---

[34] *Id.* at ¶¶ 2-4, 19. Paragraph nineteen is erroneously labelled roman numeral "XI" or eleven.
[35] *Id.* at 7. Plaintiff also sought a temporary restraining order in state court, which the Orleans Parish Civil District Court granted on July 30, 2021, but which has now expired. R. Doc. 1-3 at 2; R. Doc. 7.
[36] R. Doc. 1.
[37] R. Doc. 15.
[38] *Id.*
[39] *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).
[40] *See Manguno v. Prudential Property and Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).

When removal is based on federal question jurisdiction, the removing party must demonstrate the case "aris[es] under the Constitution, laws, or treaties of the United States."[41] "[F]ederal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law."[42] However, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."[43] "Th[is] doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."[44]

The Supreme Court has recognized this doctrine, exercising federal question jurisdiction over substantial issues of federal law, since the early twentieth century.[45] For example, in *Smith v. Kansas City Title & Trust Co.*, the Supreme Court considered whether an action brought by a bank shareholder challenging the bank's purchase of federally issued bonds raised a federal question.[46] The shareholder brought suit under state law but challenged the authority of the bank on the ground that the bonds had been issued in violation of the U.S. Constitution.[47] In that case, the Supreme Court held that, although the state supplied the cause of action, the principal issue in the case was federal—the constitutionality of the bond at issue.[48] The Court reasoned a state-law claim could give rise to federal question jurisdiction so long as it "appears from the [complaint] that the right to relief depends upon the construction or application of [federal law]."[49]

---

[41] 28 U.S.C. § 1331.
[42] *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)
[43] *Id.* (citing *Hopkins v. Walker*, 244 U.S. 486, 490–491 (1917)).
[44] *Id.*
[45] *See, e.g.*, *Hopkins*, 244 U.S. at 490–491.
[46] *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 195 (1921).
[47] *Id.* at 195-96.
[48] *Id.* at 201-02.
[49] *Id.* at 199.

Accordingly, because the right to relief turned on the construction or application of federal law, the Court held the lawsuit arose under federal law.[50]

This doctrine developed without a clear test for its application over the twentieth century, leading to differing results and what the Supreme Court described as an "unruly doctrine."[51] For instance, in *Moore v. Chesapeake & Ohio Railway Co.*, the Supreme Court took a narrower view of federal question jurisdiction than the broad rule applied in *Smith*.[52] In *Moore*, the Court held there was no federal question jurisdiction over a claim under a Kentucky tort statute that incorporated standards from a federal statute as some of its elements.[53]

In an effort to bring clarity to this doctrine, in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, the Supreme Court condensed its decisions addressing federal question jurisdiction over state-law claims into the following rule: "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."[54]

In *Grable*, the Court held a quiet title action, though brought under state law, presented a substantial federal question.[55] The defendant purchased property formerly owned by the plaintiff at a tax sale conducted on behalf of the Internal Revenue Service ("IRS") to satisfy the plaintiff's unpaid income tax obligation.[56] The plaintiff brought a quiet title action in state court alleging that the purchaser, the defendant, did not have

---

[50] *Id.*
[51] *See Gunn v. Milton*, 568 U.S. 251, 258 (2013).
[52] *See Moore v. Chesapeake & Ohio Ry. Co.*, 291 U.S. 205, 211-17 (1934).
[53] *Id.*
[54] 545 U.S. at 314.
[55] *Id.* at 315-20.
[56] *Id.* at 310-11.

good title to the property because the IRS had not properly notified the plaintiff of the sale.[57] The defendant removed the quiet title action to federal court on the ground that the case required resolution of a significant question of federal law.[58] The plaintiff moved to remand the case to state court asserting the properly pleaded complaint, on its face, alleged only a state-law cause of action.[59] The Supreme Court held removal was proper because "[w]hether [the plaintiff] was given notice within the meaning of the federal statute is . . . an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case."[60] "The meaning of the federal tax provision [was] an important issue of federal law that sensibly belongs in a federal court," and in fact "[t]he Government . . . ha[d] a direct interest in the availability of a federal forum to vindicate its own administrative action."[61] "Finally," the Supreme Court stated, "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor."[62]

In *Singh v. Duane Morris LLP*, the Fifth Circuit summarized *Grable* in the following test: federal question jurisdiction exists over a state-law claim if "(1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities."[63] On the facts of *Singh*,

---

[57] *Id.* at 311.
[58] *Id.*
[59] *Id.*
[60] *Id.* at 315.
[61] *Id.*
[62] *Id.*
[63] *Singh v. Duane Morris LLP*, 538 F.3d 334, 338 (5th Cir. 2008); *see also Gunn*, 568 U.S. at 259; *Hughes v. Chevron Phillips Chem. Co.*, 478 F. App'x 167, 170 (5th Cir. 2012).

the Fifth Circuit found there was no federal question jurisdiction.[64] *Singh* involved a legal malpractice suit against a lawyer for allegedly failing to introduce evidence that would have established an element of a federal trademark suit.[65] The Fifth Circuit found that, while the federal issue—federal trademark law—was a necessary and disputed element to the trial-within-a-trial characteristic of legal malpractice suits, the federal issue was not substantial and would have upset the balance of federal and state judicial responsibilities.[66] The court found the issue turned on evidence as applied to trademark law—predominantly a question of fact, not interpretation of law—and legal malpractice has traditionally been the domain of state law.[67] Allowing federal jurisdiction in such a case would bring a flood of legal malpractice suits into federal court.[68]

In *Hughes v. Chevron Phillips Chemical Co.*, the Fifth Circuit, applying *Grable* and *Singh*, held the district court had federal question jurisdiction over an employee's state-law claims against his employer for withholding his wages.[69] The employer claimed it was required to withhold the wages pursuant to an administrative levy from the IRS.[70] Federal jurisdiction was necessary to the resolution of the state-law claims because "it would be impossible to determine whether the Defendants–Appellees breached their fiduciary duty to him or interfered with his contract without deciding whether their actions were governed by a valid administrative levy issued by the IRS," and "[t]hat question in turn require[d] determining whether the IRS had the authority to issue an administrative levy on [the plaintiff's] unexempted wages, and whether it followed the proper procedures in

---

[64] *Singh*, 538 F.3d at 340.
[65] *Id.* at 336-37.
[66] *Id.* at 338-39.
[67] *Id.* at 337-40.
[68] *Id.* at 339-40.
[69] *Hughes*, 478 F. App'x at 168-69, 170-71.
[70] *Id.*

doing so."[71] Although the plaintiff pleaded only state-law claims, "[a] plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint."[72] A federal question was implicated because the plaintiff "clearly dispute[d] the lawfulness of the Defendants–Appellees' withholding of his wages," which was done "pursuant to an administrative levy."[73] The federal issue was substantial because "[t]he meaning of the federal tax provision is an important issue of federal law."[74] Finally, the Fifth Circuit held the exercise of jurisdiction would not disturb the balance of federal and state judicial power because "determinations regarding federal tax provisions 'sensibly belon[g] in a federal court.'"[75]

In the context of a police department consent decree, the United States District Court for the Central District of California held in *Los Angeles Police Protective League v. City of Los Angeles* there was federal question jurisdiction over police officers' claims that police department policies implemented pursuant to a consent decree violated state law and thus exceeded the federal court's authority.[76] In that case, police officers sued the city in state court for implementing a financial disclosure requirement pursuant to a consent decree with the Department of Justice, alleging the financial disclosure requirement violated state privacy laws and the California constitution, including its contract clause.[77] The district court found the lawsuit met all four requirements under *Grable* and thus posed a federal question.[78] The federal issue was necessary to the resolution of the case because "although the complaint set[] forth several state law causes

---

[71] *Id.* at 170.

[72] *Id.* at 171 (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 22 (1983)).

[73] *Id.*

[74] *Id.* (quoting *Grable*, 545 U.S. at 315).

[75] *Id.* (quoting *Grable*, 545 U.S. at 315).

[76] *L.A. Police Protective League v. City of L.A.*, No. CV 08-00784 GAF (RCx), 2008 WL 11454760, at *9-10 (C.D. Cal. June 20, 2008), *aff'd*, 314 F. App'x 72 (9th Cir. 2009).

[77] *Id.* at *4-5.

[78] *Id.* at *9-10.

of action, it essentially allege[d] that the inclusion of the financial disclosure provision of the Consent Decree [was] beyond the authority of the Court under 42 U.S.C. § 14141 and that it [was] unenforceable in the face of a conflict with allegedly applicable state law."[79] The parties disputed the federal court's authority and whether the financial disclosure implemented pursuant to the consent decree violated state law.[80] The federal issue was substantial as it "raise[d] a significant and important federal question—the scope of the federal court's remedial powers in actions brought under 42 U.S.C. § 14141."[81] In particular, "the interpretation of section 14141, which relates directly to the scope of the authority of the United States Department of Justice to remedy the systematic violation of federal civil rights by local law enforcement authorities," was "of potential national importance and . . . the kind[] of issue[] most properly resolved in a federal forum."[82] Moreover, exercising jurisdiction would not upset the division of labor between state and federal courts because "it is highly unlikely that federal courts will be presented with numerous pattern and practice lawsuits resulting in judgement [sic] either by way of consent or following litigation or that there will be numerous disputes over the scope and meaning of judgments entered in such cases."[83]

The Ninth Circuit affirmed the Central District of California's exercise of federal question jurisdiction.[84] Focusing on the police officers' state constitutional contract clause claim, the appellate court found resolution of the federal issues was necessary because, as part of its analysis of the contract clause claim, the court would have to "evaluate the Consent Decree directly" to determine whether the state had a "significant

---

[79] *Id.* at *10.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *L.A. Police Protective League v. City of L.A.*, 314 F. App'x 72, 74-75 (9th Cir. 2009).

and legitimate public purpose" behind its reforms made necessary by the Consent Decree.[85] The district court also had "wide discretion to amend the decree to include whatever procedures are required for its efficient operation."[86] The federal interest in the case was "substantial" because "the District Court 'is the principal and proper arbiter [of the Consent Decree] with the responsibility to interpret the decree and oversee the litigation.'"[87] "Finally, because a federal court has jurisdiction over a facial attack on the Consent Decree, extending jurisdiction to this related case [would] not reasonably disturb 'Congress's intended division of labor between state and federal courts.'"[88]

Especially analogous to this case, in *Morris v. Police Civil Service Commission for the City of Charleston*, the Sixth Circuit held the federal district court had subject matter jurisdiction over purely state-law claims that attacked new police department promotion procedures, which were implemented in accordance with a federal consent decree.[89] Although *Moore* was decided before *Grable*, it was based on the same principles *Grable* affirmed.[90] "The general rule that a federal question must appear in a wellpleaded [sic] complaint for an action to be removable," the court reasoned, "does not prevent removal where the real nature of the claim asserted is federal, irrespective of whether it is so characterized."[91] While, "[o]n its face, Plaintiffs' complaint purport[ed] to raise only issues of state law[,] . . . the subject matter of the complaint was the promotion eligibility list for members of the City of Charleston Police Department, which is governed by a federal decree designed to bring the promotion practices into compliance with federal

---

[85] *Id.* at 74 (quoting *Barrett v. Dawson*, 71 Cal. Rptr. 2d 899, 902 (Cal. Ct. App. 1998)).
[86] *Id.* (quoting *Keith v. Volpe*, 784 F.2d 1457, 1461 (9th Cir.1986)).
[87] *Id.* (alteration in original) (quoting *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007)).
[88] *Id.* (citation omitted) (quoting *Grable*, 545 U.S. at 319) (citing *Nehmer*, 494 F.3d at 860).
[89] *Morris v. Police Civ. Serv. Comm'n for the City of Charleston*, 977 F.2d 573 (6th Cir. 1992) (table), 1992 WL 296554, at *2 (unpublished opinion).
[90] *See id.*
[91] *Id.*

civil rights laws."[92] The plaintiffs sought an injunction against using these promotion eligibility lists, and "[b]ecause this relief could have a direct effect upon the implementation and enforcement of federal law, the case had a sufficient federal character to support removal."[93]

The Court will now examine whether Plaintiffs' claims implicate substantial federal issues under the four-part test of *Singh*.

## I.      Resolution of a Federal Issue is Necessary to the Resolution of Plaintiffs' State-law Claims.

The Consent Decree was implemented pursuant to 42 U.S.C. § 14141 (recodified at 34 U.S.C. § 12601), the Safe Streets Act, and Title VI of the Civil Rights Act.[94] This Court specifically "retain[ed] jurisdiction over this matter, including but not limited to the right to interpret, amend and enforce the Consent Decree . . . until the final remedy contemplated by the Consent Decree has been achieved."[95] Resolution of a federal issue is considered necessary if "the vindication of a right under state law necessarily turn[s] on some construction of federal law."[96]

Plaintiffs seek to have Policy Memorandum No. 143(R) and the implementation of its promotion procedures enjoined as invalid under the Louisiana constitution's civil service provisions. In compliance with Policy Memorandum No. 143(R) and pursuant to its Consent Decree obligations, NOPD implemented these promotion reforms as Chapter 32.4 of its operations manual.[97] NOPD submitted these reforms to the Office of the

---

[92] *Id.*
[93] *Id.*
[94] No. 12-1924, R. Doc. 565 at ¶ 1.
[95] No. 12-1924, R. Doc. 159 at 8.
[96] *Bd. of Comm'rs of the Se. La. Flood Prot. Auth.—East v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 723 (5th Cir. 2017) (alteration in original) (quoting *Constr. Laborers Vacation Tr.*, 463 U.S. at 9).
[97] *See* No. 12-1924, R. Doc. 565 ¶¶ 302-05; New Orleans Police Department Operations Manual, *supra* note 27, ch. 34.2.

Consent Decree Monitor, which approved them.[98] Indeed, compliance with promotions reform is one of the remaining measures standing in the way of the City's full compliance with the Consent Decree.[99]

Plaintiffs' state-law efforts to prevent the City from implementing reforms ordered by this Court necessarily call into question the Court's power to enforce the Consent Decree under 42 U.S.C. § 14141 (recodified at 34 U.S.C. § 12601), the Safe Streets Act, and the Civil Rights Act. This federal issue is necessary to the resolution of the case because, although the petition sets forth a state-law cause of action, it essentially alleges the promotions provisions of the Consent Decree were beyond the authority of the Court under 42 U.S.C. § 14141 and that these provisions are unenforceable because they conflict with state law. Similar to the Fifth Circuit's holding in *Hughes*, "it would be impossible to determine whether the Defendants['] actions were proper "without deciding whether their actions were governed by a valid" Consent Decree.[100] In analyzing a nearly identical issue to this case—state-law attacks on implementation of a federal consent decree's police department promotion reforms—the Sixth Circuit came to the same conclusion: "[b]ecause [injunctive] relief could have a direct effect upon the implementation and enforcement of federal law, the case had a sufficient federal character to support removal."[101] The Central District of California in *Los Angeles Police Protective League* held the same, finding a necessary federal issue in state-law challenges to implementation of a consent decree to be whether a "provision of the Consent Decree is beyond the authority of the Court under 42 U.S.C. § 14141 and . . . is unenforceable in the face of a

---

[98] Letter from David L. Douglas, Office of the Consent Decree Monitor, to Otha Sandifer, Deputy Superintendent, New Orleans Police Department Compliance Bureau, *supra* note 28.
[99] No. 12-1924, R. Doc. 613-1 at 40.
[100] *See Hughes*, 478 F. App'x at 170.
[101] *Morris*, 1992 WL 296554, at *2.

conflict with allegedly applicable state law."[102] In affirming the Central District of California, the Ninth Circuit agreed that the district court had jurisdiction through its "wide discretion to amend the decree to include whatever procedures are required for its efficient operation."[103]

This Court specifically retained jurisdiction to interpret and enforce the NOPD Consent Decree, which includes determining whether the promotions provision may be enforced due to a lack of federal authority or a conflict with state law. In fact, this Court, specifically noting the Consent Decree's promotions provision, allowed Plaintiffs PANO and Glasser to re-urge their motion to intervene in the Consent Decree case in the event they thought police officers' civil service rights were violated.[104] They did not do so; instead they attempted to circumvent the Court's jurisdiction by filing state-law challenges in state court. "[A] plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint."[105] Accordingly, the Court finds resolution of a federal issue is necessary to the resolution of Plaintiffs' state-law claims.

## II.    The Federal Issue Is Actually Disputed.

The dispute in this case is whether promotion reforms required by the Consent Decree should be enjoined as violative of state law, or whether this Court has authority under federal law to require the implementation of a constitutional promotions process. In *Hughes*, the Fifth Circuit held the federal issue was actually disputed because the plaintiff "clearly dispute[d] the lawfulness of the Defendants–Appellees' withholding of

---

[102] *L.A. Police Protective League*, 2008 WL 11454760, at *10.
[103] *L.A. Police Protective League*, 314 F. App'x at 74 (quoting *Keith v. Volpe*, 784 F.2d 1457, 1461 (9th Cir.1986)); *see also Frew ex re. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Once entered, a consent decree may be enforced.").
[104] No. 12-1924, R. Doc. 102 at 18, 24.
[105] *Hughes*, 478 F. App'x at 171 (alteration in original) (quoting *Constr. Laborers Vacation Tr.*, 463 U.S. at 22).

16

his wages," which was done "pursuant to an administrative levy."[106] Similarly, in this case, Plaintiffs seek to enjoin the City's use of Policy Memorandum No. 143(R) and the promotion reforms in Chapter 34.2 of NOPD's operations manual. As in *Hughes*, because Plaintiffs dispute the lawfulness of acts taken pursuant to federal law, the federal issue is actually disputed.

## III.   The Federal Issue Is Substantial.

A federal issue is substantial if it is significant to the "federal system as a whole."[107] The Supreme Court has found substantial federal issues for several reasons: "because state adjudication would 'undermine "the development of a uniform body of [federal] law"'; because the case presents 'a nearly pure issue of law' that would have applications to other federal cases; or because resolution of the issue has 'broad[ ] significance' for the federal government."[108] In *Los Angeles Police Protective League*, the Central District of California held the issue of the federal court's authority to enforce a consent decree was substantial because "the interpretation of section 14141, which relates directly to the scope of the authority of the United States Department of Justice to remedy the systematic violation of federal civil rights by local law enforcement authorities," was "of potential national importance and . . . the kind[] of issue[] most properly resolved in a federal forum."[109] Similarly, in affirming the Central District of California, the Ninth Circuit found the federal interest in the case was "substantial" because "the District Court 'is the principal and proper arbiter [of the Consent Decree] with the responsibility to interpret

---

[106] *Id.*; *see also L.A. Police Protective League*, 2008 WL 11454760, at *10.

[107] *Tenn. Gas Pipeline Co.*, 850 F.3d at 723 (quoting *Gunn*, 568 U.S. at 260); *see also Lamar Co. v. Miss. Transp. Comm'n*, 976 F.3d 524, 529-30 (5th Cir. 2020).

[108] *Tenn. Gas Pipeline Co.*, 850 F.3d at 724 (alterations in original) (footnotes omitted) (first quoting *Gunn*, 568 U.S. at 261); then quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006); and then quoting *Gunn*, 568 U.S. at 260).

[109] *L.A. Police Protective League*, 2008 WL 11454760, at *10.

the decree and oversee the litigation.'"[110] That reasoning applies equally in this case. This Court's authority to enforce and interpret the NOPD Consent Decree affects the authority of the Department of Justice to enter into consent decrees, and the federal government has a "direct interest in the availability of a federal forum to vindicate its" authority.[111] Moreover, this Court has retained jurisdiction to oversee the implementation of the Consent Decree in this case.  Accordingly, the Court finds the federal issue in this case to be substantial.

## IV.   Federal Jurisdiction Will Not Disturb the Balance of Federal and State Judicial Responsibilities.

Federal jurisdiction may upset the balance of federal and state judicial responsibilities if "the area of law relevant to the plaintiff's claims 'has traditionally been the domain of state law,'" such that "the exercise of federal jurisdiction . . . would 'herald[] a potentially enormous shift of traditionally state cases into federal courts.'"[112] Nevertheless, if exercise of federal jurisdiction would only bring the "rare state . . . action" into federal court, such exercise does not upset the balance federal and state judicial responsibilities.[113]

In *Los Angeles Police Protective League*, the Central District of California reasoned that, because of the relative infrequency of consent decrees, "it is highly unlikely that federal courts will be presented with numerous pattern and practice lawsuits resulting in judgement [sic] either by way of consent or following litigation or that there will be numerous disputes over the scope and meaning of judgments entered in such

---

[110] *L.A. Police Protective League*, 314 F. App'x at 74 (alteration in original) (quoting *Nehmer*, 494 F.3d at 860).
[111] *See Grable*, 545 U.S. at 315.
[112] *Tenn. Gas Pipeline Co.*, 850 F.3d at 724-25 (second alteration in original) (first quoting *Singh*, 538 F.3d at 339; and then quoting *Grable*, 545 U.S. at 319).
[113] *Id.* (quoting *Grable*, 545 U.S. at 319).

cases."[114] Affirming the Central District of California, the Ninth Circuit stated "because a federal court has jurisdiction over a facial attack on the Consent Decree, extending jurisdiction to this related case [would] not reasonably disturb 'Congress's intended division of labor between state and federal courts.'"[115] The Sixth Circuit has similarly held that "[b]ecause . . . federal consent decrees, by definition, stem from a matter already within the court's jurisdiction, the district court's exercise of jurisdiction over this matter would not open the floodgates of litigation that might overwhelm the federal courts."[116] The Sixth Circuit explained that "a contrary holding that the district court lacks jurisdiction could allow litigants to use the state courts as a vehicle to undermine a federal court's ability to police its consent decrees."[117] The reasoning of these cases is on point with this case. Moreover, this Court already has jurisdiction to oversee implementation of the Consent Decree, and allowing state courts to adjudicate related state-law attacks will undermine this Court's ability to oversee and enforce implementation.  Accordingly, the Court finds the exercise of federal jurisdiction will not disturb the balance of federal and state judicial responsibilities.

Because the Court finds that resolution of **a federal issue is necessary to the resolution of Plaintiffs' state-law claims, the federal issue is actually disputed, the federal issue is substantial, and federal jurisdiction will not disturb the balance of federal and**

---

[114] *L.A. Police Protective League*, 2008 WL 11454760, at *10.

[115] *L.A. Police Protective League*, 314 F. App'x at 74 (citation omitted) (quoting *Grable*, 545 U.S. at 319) (citing *Nehmer*, 494 F.3d at 860).

[116] *United States v. City of Loveland*, 621 F.3d 465, 472 (6th Cir. 2010); *see also Camillus Clean Air Coal. v. Honeywell Int'l, Inc.*, No. 5:13–CV–365 (FJS/DEP), 2013 WL 4774507, at *2 & n.2 (N.D.N.Y. Sept. 4, 2013) (citing *City of Loveland*, 621 F.3d at 472).

[117] *Id.*; *see also Camillus Clean Air Coal.*, 2013 WL 4774507, at *2 & n.2

state judicial responsibilities, the Court has federal question jurisdiction over Plaintiffs'
claims, and removal was proper.[118]

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion to remand[119] filed by Plaintiffs Police
Association of New Orleans, Michael Glasser, Andrew Weiderman, Paul Johnson, and
Beth Reniff is **DENIED**.

**New Orleans, Louisiana, on this 19th day of November, 2021.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[118] Because the Court finds it has federal question jurisdiction over Plaintiffs' claims, it need not address the
City's alternative arguments that removal was proper under the federal officer removal statute, 28 U.S.C. §
1442(a), or under 28 U.S.C. § 1443(2). R. Doc. 16 at 8-13.
[119] R. Doc. 15.