## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **THE POLICE ASSOCIATION** | **CIVIL ACTION** |
| **OF NEW ORLEANS, ET AL.,** | |
| **Plaintiffs** | |
| | |
| **VERSUS** | **NO. 21-1490** |
| | |
| **CITY OF NEW ORLEANS, ET AL.,** | **SECTION: "E" (2)** |
| **Defendants** | |

## ORDER AND REASONS

Before the Court is a motion to dismiss filed by Defendant the City of New Orleans (the "City").[1] Plaintiffs the Police Association of New Orleans, through its President Michael Glasser; Andrew Weiderman; Paul Johnson; and Beth Reniff (collectively, "Plaintiffs") have filed an opposition.[2] Defendant the City of New Orleans Civil Service Commission (the "Commission") has filed a partial opposition to the City's motion.[3]

Also before the Court is a motion to dismiss filed by the Commission.[4] No party has filed an opposition to the Commission's motion. For the following reasons, both motions to dismiss are **GRANTED**.

## BACKGROUND[5]

In May 2010, the United States Department of Justice notified the City it was initiating an investigation into the New Orleans Police Department ("NOPD") for an alleged pattern or practice of unlawful misconduct, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (recodified at 34 U.S.C. § 12601); the

---

[1] R. Doc. 45.
[2] R. Doc. 47.
[3] R. Doc. 46.
[4] R. Doc. 44.
[5] Unless noted otherwise, the background facts are taken from the Amended Complaint. R. Doc. 38.

anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d; and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.[6] On July 24, 2012, the Department of Justice and the City jointly moved for this Court to enter a negotiated Consent Decree.[7] This Court approved the Consent Decree on January 11, 2013.[8] For the convenience of the public and the parties, on October 2, 2018, the Court ordered an Amended and Restated Consent Decree be entered onto the record to reflect various amendments to the Consent Decree since its entry in 2013.[9]

The purpose of the Consent Decree is "to protect the constitutional rights of all members of the community, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department."[10] To achieve this goal, the Consent Decree requires NOPD to "fundamentally change the way it polices throughout the New Orleans Community."[11] Specifically, it requires "the City and the Department to implement new policies, training, and practices throughout the Department, including in the areas of: use of force; stops, searches, seizures, and arrests; photographic lineups; custodial interrogations; discriminatory policing; community engagement; recruitment; training; *performance evaluations*; *promotions*; officer assistance and support; supervision; secondary employment; and misconduct-complaint intake, investigation, and adjudication."[12] The Consent Decree requires that NOPD's "policies and procedures shall define terms clearly, comply with applicable law and the

---

[6] *United States v. City of New Orleans*, No. 12-1924, (E.D. La. July. 24, 2012), R. Doc. 1-1 (Report of the Department of Justice); *see also* No. 12-1924, R. Doc. 565 at 6-7 (recounting the background of the Consent Decree).
[7] No. 12-1924, R. Doc. 2; *see also* R. Doc. 38 at ¶ E(1) (allegations of Amended Complaint in this case).
[8] No. 12-1924, R. Doc. 159.
[9] No. 12-1924, R. Doc. 564. The Amended and Restated Consent Decree is on the record of Case No. 12-1924 at R. Doc. 565.
[10] No. 12-1924, R. Doc. 565 at 6.
[11] *Id.*
[12] *Id.* (emphasis added).

requirements of this Agreement, and comport with best practices."[13] In particular, under the Consent Decree, NOPD must "incorporate requirements regarding bias-free policing and equal protection into its hiring, *promotions*, and *performance assessment processes*, including giving *significant weight to an individual's history of sustained bias-related violations, as well as using interviews and other methods* to assess the individual's ability to effectively practice bias-free policing."[14]

In Section XIV of the Consent Decree, Performance Evaluations and Promotions, the parties agreed they should ensure officers who police effectively and ethically are recognized through the performance evaluation process and that these officers are identified and receive appropriate consideration for promotion.[15] Provisions regarding NOPD's promotion practices appear in paragraphs 302-305 of the Consent Decree.[16] They provide:

> 302.   Within 365 days of the Effective Date, NOPD agrees to work with Civil Service to develop and implement fair and consistent promotions practices that comport with best police practices and the requirements of this Agreement and result in the promotion of officers who are both ethical and effective. NOPD agrees to work with Civil Service to provide clear guidance on promotional criteria, and to prioritize effective, constitutional, and community-oriented policing as criteria for promotion.
>
> 303. NOPD agrees to request that Civil Service remove from the promotional eligibility list any officer whose history does not strongly indicate that the officer is likely to be ethical and effective in the position to which he or she is being considered for promotion. Factors to be considered in making this assessment include:
>
>> a) effective use of community-policing strategies;
>> b) number of sustained and not sustained complaints;
>> c) number and circumstances of uses of force, including any found out of policy and use of force complaints;
>> d) disciplinary history;
>> e) problem-solving skills;

---

[13] *Id.* at ¶ 16.
[14] *Id.* at ¶ 182 (emphasis added).
[15] *Id.* at 75.
[16] *Id.* at ¶¶ 295-305.

f) interpersonal skills;
g) education; and
h) support for departmental integrity measures.

304.   NOPD agrees to work with Civil Service to establish specific criteria for disciplinary findings, which shall make an officer presumptively ineligible for promotion for a certain time period. Officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall not be eligible for promotion.

305.   The City agrees to work with Civil Service to create opportunities for officers to be placed on the promotional list at least every two years.[17]

On August 12, 2020, the City Chief Administrative Office ("CAO") promulgated Policy Memorandum No. 143(R), which is entitled "Promotion Procedure for Classified, Non-civilian (Commissioned) Positions."[18] The purpose of COA Policy Memorandum No. 143(R) is "to define the official procedure for promotions of classified, non-civilian ("commissioned") positions," under which "promotions will be conducted in order of Composite Score."[19] This Composite Score is comprised of two equally weighed components. [20]

First, the applicant takes the Civil Service examination, administered by the Department of Civil Service.[21] The applicant's examination ranking is converted to a score on a scale of 100.[22]

Second, the relevant City entity seeking to fill a vacant position—referred to as the Appointing Authority—convenes a Promotion Committee, comprised of at least three

---

[17] *Id.* at ¶¶ 302-05; *see also* R. Doc. 38 at ¶ E(2) (allegations of Amended Complaint in this case).
[18] R. Doc. 38 at ¶ E(3) (citing R. Doc. 1-2 at 10-13); *see also* R. Doc. 1-2 at 10-14. CAO Policy Memorandum 143(R) was attached to Plaintiffs' original petition, and they continue to directly cite and reference it throughout the Amended Complaint. CAO Policy Memorandum 143(R) is also available publicly on the City's website. *Chief Administrative Office Policy Memoranda*, Nola.gov, https://www.nola.gov/chief-administrative-office/policies/ (last visited July 22, 2022).
[19] R. Doc. 1-2 at 10; R. Doc. 38 at ¶ E(4).
[20] R. Doc. 1-2 at 10; R. Doc. 38 at ¶ E(4).
[21] R. Doc. 1-2 at 11; R. Doc. 38 at ¶ E(4).
[22] R. Doc. 1-2 at 12-13; R. Doc. 38 at ¶ E(4).

employees with a minimum rank of Deputy or Assistant Superintendent.[23] The Promotion Committee conducts a "holistic review of each applicant's merit and fitness for promotion to the vacant position" as demonstrated by three components: performance evaluations, disciplinary history, and job history.[24] Based upon this evaluation, the Promotion Committee rates each applicant in one of three ways: High (H), meaning the "Applicant is recommended for immediate promotion;" Medium (M), meaning the "Applicant is acceptable for immediate promotion;" and Low (L), meaning the "Applicant is not recommended for immediate promotion."[25] The Promotion Committee "must provide a written explanation that clearly describes the reason(s) for this rating, including specific information that supports the rating," and the appointing authority must maintain all records "considered or created by the Promotion Committee" for any period required by law and in a way that allows "them to be readily produced and reviewed by the applicant."[26] The Promotion Committee "will aim to reach consensus on each applicant's rating; however, each Promotion Committee member will ultimately provide an individual rating of each applicant based upon his or her evaluation."[27] The Appointing Authority will average the ratings from the Promotion Committee and awards points out of 100 based on the following rubric: High (H) equals 100 points, Medium (M) equals 50 points, and Low (L) equals 0 points.[28] After adding the Civil Service examination score and the Promotion Committee score, the "applicant with the highest Composite Score must be selected for promotion to fill the vacant position."[29]

---

[23] R. Doc. 1-2 at 11; R. Doc. 38 at ¶ E(4).
[24] R. Doc. 1-2 at 11; R. Doc. 38 at ¶ E(4).
[25] R. Doc. 1-2 at 11.
[26] *Id*. at 12.
[27] *Id*. at 11-12.
[28] *Id*. at 12-13; R. Doc. 38 at ¶ E(4).
[29] R. Doc. 1-2 at 12.

Plaintiffs allege NOPD used CAO Policy Memorandum 143(R) during the promotions process for the position of sergeant in July 2021.[30] Plaintiffs Weiderman, Johnson, and Reniff are NOPD police officers who each applied for promotion to sergeant.[31] Based solely on the Civil Service examination score, Weiderman was listed in band 1; however, after the Promotion Committee's evaluation was factored in, he was ranked 24 of 65 applicants.[32] Johnson was originally ranked 16 of 67 based solely on his Civil Service examination score, but after the Promotion Committee's evaluation was factored in, he was ranked 34 of 65 applicants.[33] Similarly, Reniff's ranking changed from 18 to 36 after evaluation by the Promotion Committee.[34] Weiderman, Johnson, and Reniff did not receive a promotion to the rank of sergeant.[35]

Plaintiffs seek a declaration that the City has violated the laws and constitution of the State of Louisiana as well as the Consent Decree and seek an injunction against the City prohibiting it from applying CAO Policy Memorandum 143(R).[36] Plaintiffs bring three challenges to the application of CAO Policy Memorandum 143(R).[37] First, they allege the City violated the Consent Decree in enacting CAO Policy Memorandum 143(R) because the City did not invite the Commission to participate in the drafting of CAO Policy Memorandum 143(R) and because the Commission has not approved CAO Policy

---

[30] R. Doc. 38 at ¶¶ E(6), (8). The Court notes that NOPD has enacted additional guidelines contained in Chapter 34.2 of the NOPD Operations Manual, which outline how NOPD Promotion Committee members are selected and how the Promotion Committee reviews applicants. Chapter 32.4 also lists eleven specific factors the Promotion Committee may consider in evaluating promotion candidates—all more detailed than CAO Policy Memorandum 143(R). Paragraph 21 of Chapter 32.4 incorporates the three criteria listed in CAO Policy Memorandum 143(R). These three criteria are listed among the eleven factors NOPD's Promotion Committee may consider in Paragraph 30, as well. However, as the Court is considering a motion to dismiss, the Court takes the allegations in the Amended Complaint as true and assumes only the three factors listed in CAO Policy Memorandum 143(R) were used by NOPD in its evaluation of applicants.
[31] R. Doc. 38 at ¶¶ B(1), E(6) (citing R. Doc. 1-2 at 1).
[32] *Id.* at ¶ E(6). Plaintiffs do not allege the initial bands in which Johnson and Reniff were placed.
[33] *Id.*
[34] *Id.*
[35] *Id.* at ¶ E(8).
[36] *See id.* at p. 5 ¶ 9, and p. 9.
[37] *Id.* at 9.

Memorandum 143(R).[38] Second, Plaintiffs argue the City's adoption of promotion criteria in CAO Policy Memorandum 143(R) infringes on the Commission's exclusive right under Article X, Section 10 of the Louisiana Constitution to adopt rules concerning promotions.[39] Finally, Plaintiffs allege CAO Policy Memorandum 143(R) violates the requirement under Article X, Section 7 of Louisiana Constitution that promotions be made on the basis of merit.[40] Specifically, Plaintiffs allege the City's performance evaluations are "strictly subjective in nature, and can be manipulated in either direction depending upon the whims of the evaluator;" disciplinary history is "subjective, potentially misleading and can be manipulated" because NOPD's "record keeping ability is lacking" and "some investigations may be biased and/or inaccurate;" and job history, including both "position and assignments as well as schools attended," is "controlled by NOPD" and "subject to manipulation."[41]

Both the Commission and the City have now filed motions to dismiss. The Commission seeks dismissal because the Amended Complaint does not contain any allegations against it and does not seek any relief from it.[42] The City seeks dismissal, arguing 1) the Plaintiffs have no standing to enforce the provisions of the Consent Decree; 2) the City may adopt its own promotion criteria without infringing upon the Commission's Article X, Section 10 rulemaking authority; 3) the City is not bound by the merit requirements in Article X, Section 7; 4) even if the City is bound by Article X, Section 7, the criteria adopted are merit-based; and 5) even if the criteria adopted are not merit-based, the Consent Decree requires their adoption.[43]

---

[38] *Id.* at ¶¶ E(9), (12).
[39] *Id.* at ¶ E(10).
[40] *Id.*
[41] *Id.* at ¶ E(5).
[42] R. Doc. 44.
[43] R. Doc. 45.

## **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of her claim that would entitle her to relief.[44] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[45] The Court may also review "any documents attached to the complaint"[46] and may "take judicial notice of matters of public record."[47] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[48] However, the court does not accept as true legal conclusions or mere conclusory statements,[49] and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[50] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[51]

In summary, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[52] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

---

[44] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

[45] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[46] *Lone Star Fund V (U.S.) v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000)).

[47] *Norris v. Hearst Tr.*, 500 F.3d 454, 561 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir.1994)).

[48] *Iqbal*, 556 U.S. at 678.

[49] *Id.*

[50] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).

[51] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).

[52] *Twombly*, 550 U.S. at 555.

'show[n]'—that the pleader is entitled to relief."[53] "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'"[54]

## LAW AND ANALYSIS

### I.    Plaintiffs Have Not Stated a Claim Against the Commission.

Plaintiffs name the Commission as a Defendant in the Amended Complaint.[55] However, the Amended Complaint contains no allegations that the Commission harmed the Plaintiffs in any way or violated any laws, and the prayer for relief requests relief only with respect to the City.[56] Accordingly, the Commission seeks to be dismissed because Plaintiffs have failed to state a claim against it.[57] Plaintiffs have not filed an opposition to the Commission's motion to dismiss.

Rule 8 of the Federal Rules of Civil Procedure requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[58] The purpose of this requirement is "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[59] The Commission is an entity created by the Louisiana Constitution and separate and apart from the City.[60] It is an "autonomous bod[y],"[61] which "is authorized to establish rules governing the administration of the system, is empowered in general to supervise the conduct and administration of the system, and is a quasi-judicial body for purposes of appeal."[62] The Amended Complaint

---

[53] *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).

[54] *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (per curiam) (unpublished) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

[55] R. Doc. 38 at ¶ B(2); R. Doc. 1-2 at 2.

[56] *See* R. Doc. 38.

[57] R. Doc. 44-1.

[58] Fed. R. Civ. P. 8(a)(2).

[59] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[60] La. Const. art. X, §§ 1(B), 4.

[61] *Civ. Serv. Comm'n of the City of New Orleans v. Guste*, 428 So. 2d 457, 462 (La. 1983).

[62] *New Orleans Firefighters Ass'n v. Civ. Serv. Comm'n of the City of New Orleans* (*Firefighter I*), 422 So. 2d 402, 410 (La. 1982).

makes no allegations against the Commission and requests no relief from it. Accordingly, even if the allegations of the Amended Complaint are accepted as true, the Amended Complaint does not state a claim for relief against the Commission. Because Plaintiffs have failed to state a claim against the Commission, an entity separate from the City, the Commission must be dismissed.

## II.     Plaintiffs Have No Standing to Enforce Provisions of the Consent Decree.

Plaintiffs seek a declaration that the City violated paragraphs 302-305 of the Consent Decree by enacting CAO Policy Memorandum 143(R) because the City did not invite the Commission to participate in the drafting of CAO Policy Memorandum 143(R) and because the Commission has not approved CAO Policy Memorandum 143(R).[63] The City argues Plaintiffs have no standing to enforce the Consent Decree and, as a result, no right to a declaratory judgment.[64]

The Supreme Court has stated that "a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."[65] The United States Court of Appeals for the Fifth Circuit has recognized this precedent, holding non-parties do not have standing to enforce consent decrees unless a "provision of the consent decree . . . grants a non-party . . . standing to enforce its provisions."[66] In

---

[63] R. Doc. 38 at ¶¶ E(9), (12).
[64] R. Doc. 45-1 at 5-7.
[65] *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (5th Cir. 1975) (first citing *United States v. Armour & Co.*, 402 U.S. 673 (1971); and then citing *Buckeye Coal & R. Co. v. Hocking Valley Co.*, 269 U.S. 42 (1925)); *see also Shatteen v. JP Morgan Chase Bank, N.A.*, 519 F. App'x 320, 321 (5th Cir. 2013); *United States v. United Fruit Co.*, 22 F.3d 1095 (5th Cir. 1994), 1994 WL 199225, at *2 (unpublished).
[66] *United Fruit Co.*, 1994 WL 199225, at *2; *see also Shatteen*, 519 F. App'x at 321.

this case, the Consent Decree defines the "Parties" to the agreement only as the City, including NOPD, and the United States.[67] The Plaintiffs do not have standing as parties.

Plaintiffs argue they nevertheless have standing because Weiderman, Johnson, and Reniff, as NOPD officers, are employees of a party to the Consent Decree, the City.[68] In *Rafferty v. NYNEX Corp.*, the United States Court of Appeals for the D.C. Circuit held that, unless the consent decree provides otherwise, being an employee of a party to the decree does not automatically give you standing to enforce the decree.[69] In that case, a company had entered into an antitrust consent decree, which was in effect while the plaintiff was employed by the company.[70] After the plaintiff raised concerns the company was violating the decree, he was fired, and he sued the company, alleging, among other wrongs, that the company violated the consent decree.[71] The D.C. Circuit held the plaintiff lacked standing to enforce the consent decree because, "[u]nless a government consent decree stipulates that it may be enforced by a third party beneficiary, only the parties to the decree can seek enforcement of it."[72] Even though some provisions of the consent decree were related to employees by requiring the company "to advise [its] employees of [its] legal obligations under the decree," the court found "[t]he decree contains no language providing that . . . company employees are third party beneficiaries," and "the decree nowhere authorizes a third party to enforce its obligations."[73]

---

[67] No. 12-1924, R. Doc. 565 at 6.
[68] R. Doc. 47 at 4-5.
[69] *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 849 (D.C. Cir. 1995).
[70] *Id.* at 846-47.
[71] *Id.*
[72] *Id.* at 849.
[73] *Id.*

In this case, under the reasoning of *Rafferty*, Plaintiffs do not have standing solely by being the employees of a party to the Consent Decree. Further, the Consent Decree specifically provides,

> 9.      This Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.
>
> . . . .
>
> 11.      This Agreement is not intended to limit or expand the right of any person or organization to seek relief against the City, NOPD, or any officer or employee thereof, for their conduct or the conduct of NOPD officers; accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law.[74]

Plaintiffs point to another provision of the Consent Decree that provides, "This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors."[75] However, the fact that the Consent Decree is binding on the Plaintiffs does not convert Plaintiffs into third-party beneficiaries of the Consent Decree, especially when Paragraph 9 specifically states the Consent Decree shall be enforced only by the "Parties"—defined only as the City, including NOPD, and the United States—without any reference to employees.

Accordingly, because Plaintiffs are not parties to or third-party beneficiaries of the Consent Decree, and because the Consent Decree does not grant Plaintiffs the right to enforce its provisions, Plaintiffs lack standing to enforce provisions of the Consent Decree. Thus, because the Plaintiffs have no standing to enforce the Consent Decree, the

---

[74] No. 12-1924, R. Doc. 565 at ¶¶ 9, 11.
[75] *Id*. at ¶ 8.

Court need not address whether CAO Policy Memorandum 143(R) violates the terms of the Consent Decree.[76]

## III.    The City Did Not Infringe on the Commission's Rulemaking Authority by Enacting COA Policy Memorandum No. 143(R).

Plaintiffs allege the Commission has the exclusive power to adopt rules concerning promotions within the Civil Service, and the City infringed on this power when enacting COA Policy Memorandum No. 143(R).[77] The City argues the Louisiana Constitution gives the Appointing Authority discretion in choosing candidates, and the Commission's rulemaking authority in Article X, Section 10 does not override this discretion.[78]

Article X, Section 10 of the Louisiana Constitution provides, in relevant part,

Each commission is vested with broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters and transactions; to adopt a uniform pay and classification plan; to require an appointing authority to institute an employee training and safety program; and generally to accomplish the objectives and purposes of the merit system of civil service as herein established.[79]

The Louisiana Supreme Court has interpreted this provision to mean "a city civil service commission has the exclusive power to adopt rules regulating the classified service in the areas specifically enumerated in Section 10(A)(1), and the city governing authority cannot

---

[76] The Commission agrees and argues the Court should not decide whether the City has violated the terms of the Consent Decree because Plaintiffs and the Commission are not parties to the Consent Decree. R. Doc. 46 at 3-4.

[77] R. Doc. 38 at ¶ E(10).

[78] R. Doc. 45-1 at 10-11.

[79] La. Const. art X, § 10(A)(1)(a). The provisions of Article X, Part I, which include Section 10, are operable in cities having a population exceeding 400,000 individuals. La. Const. art X, §§ 1(B), 4(A). Since the current Louisiana Constitution was adopted, the population of New Orleans has fallen below 400,000. However, the Louisiana Fourth Circuit Court of Appeal has held that New Orleans is permanently governed by provisions of Article X, Part I, despite its lower population. *Concerned Classified City Emps. v. Civ. Serv. Comm'n for the City of New Orleans*, 2015-0654, p. 13 (La. App. 4 Cir. 1/6/16), 184 So. 3d 824, 833.

constitutionally infringe on the commission's exercise of this power."[80] "[I]n areas of power affecting public employees which are not enumerated in Section 10(A)(1), a commission's powers should not be expanded beyond those necessary to effectuate the objectives and purposes of the civil service."[81] However, simply because a state or city policy touches on one of the areas enumerated in Section 10(A)(1) does not necessarily mean the area falls under the Commission's exclusive authority.[82] The Louisiana Supreme Court has examined the issue especially carefully when the Louisiana Constitution grants similar authority to another government actor.[83]

For example, in *New Orleans Firefighters Association v. Civil Service Commission of the City of New Orleans* (*Firefighters I*), the Louisiana Supreme Court held the Commission did not have the power to modify statewide minimum wage levels established by the Legislature in order to adopt a uniform pay and classification plan for the City.[84] In that case, the court compared the Legislature's constitutional "plenary power to enact law providing for the minimum wages and working conditions of firemen" with the Commission's enumerated Article X, Section 10 power to "to adopt a uniform pay plan."[85] Looking to the history of Article X, Section 10's adoption, the court found "[t]here was no attempt to reopen the dispute over the legislature's power to set minimum wages

---

[80] *New Orleans Firefighters Ass'n Local 632, AFL-CIO v. City of New Orleans* (*Firefighters II*), 590 So. 2d 1172, 1175 (La. 1991).

[81] *Id*. at 1176.

[82] *See, e.g.*, *Firefighter I*, 422 So. 2d at 409-11; *Firefighters II*, 590 So. 2d at 1176-77; *Police Ass'n of New Orleans v. City of New Orleans* (*PANO II*), 94-1078, pp. 6-9 (La. 1/17/95), 649 So. 2d 951, 958-89, *abrogated on other grounds by State ex re. Olivieri v. Hutchinson*, 2000-0172 (La. 2/21/01), 779 So. 2d 735; *Civ. Serv. Comm'n of the City of New Orleans v. City of New Orleans*, 2002-1812, pp. 12-20 (La. 9/9/03), 854 So. 2d 322, 327-36.

[83] *See, e.g.*, *Firefighter I*, 422 So. 2d at 409-11; *Firefighters II*, 590 So. 2d at 1176-77; *PANO II*, 94-1078, at pp. 6-9, 649 So. 2d at 958-89; *Civ. Serv. Comm'n*, 2002-1812, at pp. 12-20, 854 So. 2d at 327-36.

[84] *Firefighters I*, 422 So. 2d at 409-11.

[85] *Id*. at 409.

for firemen and municipal policemen," and thus it was not within the Commission's exclusive authority to adopt a uniform pay plan.[86]

The court in *Firefighters I* then examined "the objectives and purposes of the merit system of civil service and classified service."[87] Noting the Commission is a "quasi-judicial" entity tasked with "see[ing] to it that the rank and file of state and city employees are selected competitively on the basis of merit, free from political influence," the court found the Commission is "authorized to establish rules governing the administration of the system, is empowered in general to supervise the conduct and administration of the system, and is a quasi-judicial body for purposes of appeal." However, "it is not necessary that the Civil Service Commission's quasi-judicial function include the power to override state minimum wage and working condition laws for firemen and municipal policemen enacted by the legislature pursuant to its conception of a compelling state interest" because "[t]o safeguard merit selection and promotion, protect against discriminatory dismissal or treatment and free public employees from political influence or reprisal does not require that the City Civil Service Commission have the faculty to modify statewide minimum wage levels or labor standards."[88] Indeed, "[t]here is no inherent conflict between the power to establish a minimum wage level and the power to fix salaries above this floor because these powers operate on different planes to accomplish different purposes" because "[m]inimum wage laws guarantee workers at least a living wage," while "[u]niform pay plans protect them from unfair wage discrimination." "In the event of a disagreement between the civil service commission and the legislature as to what ought to be the minimum wage level of a fireman or municipal policeman, of course, the

---

[86] *See id.*
[87] *Id.* at 410.
[88] *Id.* at 410-11.

commission must yield because this policy question is outside the ambit of its quasi-judicial function."[89]

In *New Orleans Firefighters Association Local 632, AFL-CIO v. City of New Orleans* (*Firefighters II*), the Louisiana Supreme Court held the Commission's Article X, Section 10 rulemaking authority did not prohibit the City from adopting a residency requirement for its employees.[90] The City adopted a residency requirement in 1990 that "authorize[d] the removal of a public employee who violates the provision."[91] The court compared "the power of the municipal governing authority constituting the legislative branch" to adopt a residency requirement with the Commission's enumerated Article X, Section 10 power to adopt rules concerning "removal."[92] The court defined removal as the "permanent separation from employment."[93] Although the residency requirement authorized the City to remove employees, the court distinguished this power, holding "a commission's power to regulate removal deals more with fairness and procedural safeguards in the removal process and not with the question of whether a municipal governing authority may impose reasonable requirements upon its employees, the violation of which constitutes grounds for removal."[94] "The question whether this particular requirement is reasonable is an issue separate from the alleged violation of Section 10(A)(1)."[95] Thus, the court found "[t]he power to adopt a residency requirement does not fall within a commission's express power to adopt rules regulating the . . . removal of public employees."[96]

---

[89] *Id.* at 411.
[90] *Firefighters II*, 590 So. 2d at 1176-77.
[91] *Id.* at 1176 n.6.
[92] *Id.* at 1176 & n.6.
[93] *Id.* at 1176.
[94] *Id.* at 1176 n.6.
[95] *Id.*
[96] *Id.* at 1176.

Next, examining the objectives and purpose of the civil service system, the court in *Firefighters II* found "[n]either is it necessary in this case for the Civil Service Commission of the City of New Orleans to have the exclusive power to adopt domiciliary or residency requirements in order to achieve generally the principal objectives of civil service" because a "residency requirement is unrelated to the selection and promotion of public employees on the basis of merit, fitness and qualifications, to the security of tenure of public employees, or to the protection of public employees against political, religious, racial, gender or similar discrimination or intimidation."[97]

In 1992, the City adopted an amended residency requirement that, while employees residing outside of the City prior to December 10, 1990, were allowed to remain in their positions, they were required "to establish a domicile within the city in order to accept a promotion," with some exceptions.[98] In *Police Association of New Orleans v. City of New Orleans* (*PANO* I), the Louisiana Fourth Circuit Court of Appeal held that the City's rule violated Article X, Sections 7 and 10 of the Louisiana Constitution, reasoning that "permanently bar[ring]  promotional opportunities to certain incumbent classified civil service employees domiciled outside of Orleans Parish," in effect "destroys the competitive promotional system based on merit and infringes upon the Commission's express and exclusive powers to adopt rules regulating promotion and establishing a general system of promotion pursuant to Article 10, Section 7."[99] The City raised the argument that Article X, Section 10 concerned only the Commission's obligation to certify eligible candidates through "promotional lists based on merit, fitness and qualifications," not the City's subsequent discretion as the appointing authority to choose which

---

[97] *Id.* at 1177.
[98] *PANO II*, 94-1078, at p. 6, 649 So. 2d at 958.
[99] *Police Ass'n of New Orleans v. City of New Orleans* (*PANO I*), 635 So. 2d 380, 385 (La. Ct. App. 4th Cir. 1994), *rev'd in part, aff'd in part*, 94-1078 (La. 1/17/95), 649 So. 2d 951.

candidate to promote, but the Fourth Circuit rejected this argument, holding "[t]he City's attempt to make a distinction between the Civil Service's exclusive powers and the appointing authority's powers, is a distinction that makes no difference" because "[t]he fact remains, promotion is denied based on domicile," which "completely undermines the Civil Service and its function."[100]

However, on review the Supreme Court disagreed with the Fourth Circuit's reasoning and reversed.[101] In *Police Association of New Orleans v. City of New Orleans* (*PANO II*), the Louisiana Supreme Court extended its reasoning regarding the residency requirement of *Firefighters II* to a residency requirement affecting promotions of police officers.[102] "Article X, Section 7," the Supreme Court held, "merely sets out the criteria to be used, and grants the Civil Service Commission the power to devise the method by which, employees are certified as eligible for appointment or promotion."[103] The City's residence requirement did "not impinge upon these methods and criteria set out in Section 7 for determining those eligible for promotion," but "merely require[d] that prior to acceptance of the promotion and appointment to the new position, the eligible employee must establish his domicile in Orleans Parish."[104] Citing *Firefighters II*, the court held "such a domiciliary requirement is unrelated to the selection and promotion of public employees on the basis of merit, fitness and qualifications."[105] Thus, "it is not necessary that the Civil Service Commission have exclusive power to adopt domiciliary or residency requirements in order to achieve the principal objectives of civil service, and

---

[100] *Id.* at 384.
[101] *PANO II*, 94-1078, at pp. 6-9, 649 So. 2d at 958-59.
[102] *Id.*
[103] *Id.* at p. 7, 649 So. 2d at 959.
[104] *Id.* at pp. 7-8, 649 So. 2d at 959.
[105] *Id.* at p. 8, 649 So. 2d at 959.

such powers have not been granted to the Civil Service Commission under either Section 7 or 10(A)(1)."[106]

In *Civil Service Commission of the City of New Orleans v. City of New Orleans*, the Louisiana Supreme Court held the Commission did not have the power to mandate Commission approval of City contracts privatizing parts of its workforce.[107] In that case, the City entered into a contract privatizing management of certain City facilities, but the Commission sought to have the contract declared null because it was not approved by the Commission, as required by the Commission's rules.[108] The court compared the power of a municipal authority governed by a home rule charter, which, "in affairs of local concern within its jurisdiction, . . . are as broad as those of the state, except when limited by the Constitution, laws permitted by the Constitution, or its own home rule charter," with the Commission's enumerated Article X, Section 10 power to adopt rules concerning "removal." Citing *Firefighters II* and *PANO II*, the court held the City "has the power to make rules that incidentally affect 'employment' of classified workers and even result in their 'removal,' where the ability to make such rules are not a part of the Commission's constitutionally enumerated powers," and because "no specific language under Art. 10, Sec. 10(A)(1) . . . gives the Commission the power to make rules concerning the approval of contracts to manage and operate City facilities," the City did not infringe on the Commission's exclusive authority.[109]

Turning to the objectives and purpose of the civil service, the court in *Civil Service Commission* held "privatization does not necessarily run afoul of the constitutionally created civil service system" because "[t]he Home Rule Charter gives the mayor and city

---

[106] *Id.*
[107] *Civ. Serv. Comm'n*, 2002-1812, at pp. 12-20, 854 So. 2d at 327-36.
[108] *Id.* at pp. 1-2, 854 So. 2d at 325.
[109] *Id.* at pp. 11-13, 854 So. 2d at 331-32.

council broad authority to enter into contracts for professional services," the "constitution provides certain protections for civil servants laid off for economic or other reasons," and "privatization may provide important benefits by reducing costs and increasing governmental efficiency and productivity."[110]

With these cases in mind, the Court will examine the respective roles of the City and Commission in the promotion process. Article X, Section 7 is the relevant constitutional provision:

> Permanent appointments and promotions in the classified state and city service shall be made only *after certification by the appropriate department of civil service* under a general system based upon merit, efficiency, fitness, and length of service, as ascertained by examination which, so far as practical, shall be competitive. The number to be certified shall not be less than three; however, if more than one vacancy is to be filled, the name of one additional eligible for each vacancy may be certified. Each commission shall adopt rules for the method of certifying persons eligible for appointment, promotion, reemployment, and reinstatement and shall provide for appointments defined as emergency and temporary appointments if certification is not required.[111]

The language of Section 7 contemplates a two-step process. The first step is "certification by the appropriate department of civil service."[112] "[A]fter" this certification, "promotions in the classified state and city service" are made by the Appointing Authority.[113] The distinction between certification and promotion has been recognized by numerous courts, which have held the Appointing Authority has much discretion in choosing which certified candidate to promote.[114] For example, in *Lawson v. State Department of Health*

---

[110] *Id.* at pp. 17-18, 854 So. 2d at 335. The court allowed the Commission a limited review of privatization contracts, determining only whether (1) whether any civil service employees will be involuntarily displaced from the civil service; and, if so (2) whether the contract was entered into for reasons of efficiency and economy and not for politically motivated reason. *Id.* at pp. 18-19, 854 So. 2d at 335.

[111] La. Const. art. X, § 7 (emphasis added).

[112] *See id.*

[113] *See id.*

[114] *See, e.g.*, *Lawson v. State Dep't of Health & Hosps. (DHH), Cent.  La. State Hosp.*, 618 So. 2d 1002, 1004-05 (La. Ct. App. 1st Cir. 1993); *Maurice v. Dep't of Police*, 94-2368, p. 8 (La. App. 4 Cir. 6/7/95), 657 So. 2d 501, 506 (holding the court was unable to order the NOPD to promote the plaintiff to a position because, although the plaintiff's name appeared on the eligibility list, it could not say he would have been

*& Hospitals (DHH), Central Louisiana State Hospital*, the Louisiana First Circuit Court

of Appeal recognized the "appointing authority has much discretion in choosing

employees *properly certified as eligible*."[115] Furthermore, the court in *Lawson* rejected

the employee's argument that the Appointing Authority failed to consider his length of

service in denying a promotion because "length of service is one of the elements to be used

by the *appropriate civil service department in compiling the certificates of eligibility*

[under Article X, Section 7]. . . . The appointing authority's discretion in making the

appointment is not limited by the constitutional provision because length of service has

received proper consideration."[116]

Because the Louisiana Constitution contemplates the Appointing Authority having

independent discretion in choosing which certified candidate to promote, the Court finds

the City's promulgation of CAO Policy Memorandum 143(R) does not infringe on the

Commission's exclusive rulemaking authority under Article X, Section 10. The Louisiana

Supreme Court's reasoning in *PANO II* is persuasive. The court recognized the distinction

between the roles of the Commission and the Appointing Authority, explaining that

"Article X, Section 7 merely sets out the criteria to be used, and grants the Civil Service

Commission the power to devise the method by which, employees are *certified as eligible*

---

the one chosen to fill the position); *Hardouin v. City of New Orleans, Civ. Serv. Comm'n*, 487 F. Supp. 1148, 1150 (E.D. La. 1980) ("[T]here is no guarantee of promotion regardless of a person's position on the list."); *Blake v. Giarrusso*, 263 So. 2d 392, 394 (La. Ct. App. 4th Cir. 1972) ("[T]he Superintendent of Police, as the appointing authority, has no mandatory duty to promote; he enjoys 'much' discretion in choosing employees properly certified as eligible; and promotions do not take place automatically or as a matter of right."); *Sewell v. New Orleans Police Dep't*, 221 So. 2d 621, 623 (La. Ct. App. 4th Cir. 1969) ("[T]his rule gives the Superintendent of Police, as the Appointing Authority, much discretion in choosing employees for promotion certified as eligible from a list."); *Shreveport Police Officers Ass'n v. Glover*, 47,504, p. 4 (La. App. 2 Cir. 1/9/13), 108 So. 3d 791, 795 ("[I]n making appointments for competitive positions, the appointing authority is not required to promote by seniority, but has much discretion in choosing employees certified as eligible for promotion by the civil service board."); *see also* Charles S. Hyneman, *Political and Administrative Reform in the 1940 Legislature*, 3 La. L. Rev. 1, 20 (1940) ("The position does not necessarily go to the person showing the best qualifications. Three names shall be submitted for each position; the employing official may take his choice.").
[115] *Lawson*, 618 So. 2d at 1004 (emphasis added).
[116] *Id.* at 1005 (emphasis added) (footnote omitted).

*for appointment or promotion.*"[117] The City's residence requirement in that case did "not impinge upon these methods and criteria set out in Section 7 for determining those *eligible for promotion*," but "merely require[d] that prior to *acceptance of the promotion and appointment* to the new position, the eligible employee must establish his domicile in Orleans Parish."[118]

CAO Policy Memorandum 143(R) concerns promotion, which on its face is one of the enumerated areas of Article X, Section 10. However, as the Supreme Court recognized in *Civil Service Commission*, entities other than the Commission "ha[ve] the power to make rules that incidentally affect" enumerated terms so long as the rule does not infringe on "the Commission's constitutionally enumerated powers."[119] Similar to *Civil Service Commission* and *Firefighters I*, the Louisiana Constitution entrusts the second step of the promotion process to a different entity, the Appointing Authority. Likewise, in *Firefighters II*, although the City's residence requirement provided for removal—an enumerated area in Article X, Section 10—the Supreme Court noted "a commission's power to regulate removal deals more with fairness and procedural safeguards in the removal process and not with the question of whether a municipal governing authority may impose reasonable requirements upon its employees, the violation of which constitutes grounds for removal."[120] That reasoning is persuasive in this case as well because the Constitution entrusts the second step of the promotion process to the Appointing Authority.

Finally, the Commission itself has recognized that an Appointing Authority may adopt criteria by which it evaluates candidates certified for promotion. In a proceeding

---

[117] *PANO II*, 94-1078, at p. 7, 649 So. 2d at 959 (emphasis added).
[118] *Id.* at pp. 7-8, 649 So. 2d at 959.
[119] *Civ. Serv. Comm'n*, 2002-1812, at p. 11, 854 So. 2d at 331.
[120] *Firefighters II*, 590 So. 2d at 1176 n.6.

before the Commission, *Achord v. Department of Fire*, the Commission considered whether the criteria used by the New Orleans Fire Department ("NOFD") to evaluate candidates certified for promotion were improper.[121] The Commission recounted that, since 1982 when it adopted the practice of "banding" candidates who were considered tied, "appointing authoring [sic] had unfettered discretion in choosing among candidates in the same band."[122] In 2014, the Commission "changed its Rules to provide more autonomy."[123] The purpose of these changes was to create a "better system" that would "allow appointing authorities, on an objective basis, that is documented and challengeable, [to] be able to select the candidate who is the best fit for the job.'"[124] NOFD adopted fifteen factors to evaluate candidates.[125] While the Commission analyzed these factors to determine whether they were improper, the Commission never contended NOFD did not have the authority to adopt them.[126] In fact, the Commission noted "[t]he ruling we make today should not be viewed as a suggestion that an appointing authority cannot establish promotional criteria consistent with merit-based principles," and "[t]he Rules, as currently written, do not require preapproval from the Civil Service Department prior to implementation of a promotional policy" by an Appointing Authority.[127]

---

[121] *Achord v. Dep't of Fire*, Nos. 8610, 8642, 8614, 8613, 8609, 8641, 8615, 8648, 8616, 8646, 8643, 8617, 8602, 8618,8603, 8619, 8620, 8621, 8606, 8622, 8608, 8640, 8612, 8623, 8611, 8624, 8625, 8626, 8605, 8627, 8628, 8593, 8607,8630,8631,8632,8633, 8634, 8635, 8636, 8637, 8638, 8639, 8647,8604, 8655, slip op. (New Orleans Civil Service Commission May 24, 2018) (majority op.), https://www.nola.gov/civil-service/commission/decisions/, *rev'd on other grounds*, 2018-0635 (La. App. 4 Cir. 12/27/18), 318 So. 3d 816. The Commission's majority opinion was joined in full by Chairperson Craig and Commissioner Caputo. It was joined in full, except as to the conclusions expressed in section III.B, by Commissioner Tetlow.
[122] *Achord*, slip op. at 7-8.
[123] *Id.* at 27. This change was known as the Great Place to Work Initiative.
[124] *Id.* at 10.
[125] *Id.* at 14-15.
[126] *See id.* at 27-29.
[127] *Id.* at 27, 29. These sorts of promotional policies have been used before as well. *See, e.g.*, *Lawson*, 618 So. 2d at 1005 (describing the Appointing Authority's "Affirmative Action Plan" regarding promotions).

Accordingly, because the Louisiana Constitution contemplates the Appointing Authority will have independent discretion in choosing which certified candidate to promote, as the courts and the Commission have recognized, the City's adoption of CAO Policy Memorandum 143(R) does not infringe on the Commission's exclusive rulemaking power under Article X, Section 10.

The Court notes the Appointing Authority's discretion does not affect Commission's ability to "effectuate the objectives and purposes of the civil service."[128] In *Civil Service Commission*, the Supreme Court held privatization does not run afoul of the constitutionally created civil service system because 1) the City had broad authority to enact privatization under the "[t]he Home Rule Charter [which] gives the mayor and city council broad authority to enter into contracts for professional services," 2) the "constitution provides certain protections for civil servants laid off for economic or other reasons," and 3) "privatization may provide important benefits by reducing costs and increasing governmental efficiency and productivity."[129] This case is similar. First, as explained, the Louisiana Constitution entrusts the second step of the promotion process to the Appointing Authority. Second, there are adequate safeguards to prevent abuse. As the Commission noted in *Achord*, pursuant to Article X, Section 10(B) of the Louisiana Constitution, the Commission may investigate violations of the civil service provisions of the Constitution, rules, statutes, or ordinances, which "represents one of the safeguards that the Commission retained in order to ensure that appointing authorities remained faithful to the principles" of the civil service.[130] The Louisiana Supreme Court made a similar observation in *Firefighters II*, noting "[t]he question whether this particular

---

[128] *Firefighters II*, 590 So. 2d at 1176.
[129] *Civ. Serv. Comm'n*, 2002-1812, at pp. 17-18, 854 So. 2d at 335
[130] *See Achord*, slip op. at 3-4, 13 (citing La. Const. art. X, § 10(B)).

[residency] requirement is reasonable is an issue separate from the alleged violation of Section 10(A)(1)."[131] Finally, as the Commission noted in *Achord*, allowing the Appointing Authority discretion creates a "better system" in which the Appointing Authority may select the "candidate who is the best fit for the job."[132] As a result, the City's adoption of CAO Policy Memorandum 143(R) does not infringe on the Commission's authority to effect rules necessary to effectuate the objectives and purpose of the civil service.

Accordingly, the City's adoption of CAO Policy Memorandum 143(R) does not infringe on the Commission's exclusive rulemaking authority under Article X, Section 10 of the Louisiana Constitution.

## IV.   Assuming the City is Bound by Article X, Section 7, the Factors in CAO Policy Memorandum 143(R) Are Merit-Based.

Plaintiffs allege CAO Policy Memorandum 143(R) violates the requirement under Article X, Section 7 of Louisiana Constitution that promotions be made on the basis of merit.[133] The City argues it is not bound by the merit requirements in Article X, Section 7, and, even if it is, the criteria adopted are merit-based.[134]

Article X, Section 7 of the Louisiana Constitution provides:

> Permanent appointments and promotions in the classified state and city service shall be made only after certification by the appropriate department of civil service under a general system based upon *merit, efficiency, fitness, and length of service, as ascertained by examination which, so far as practical, shall be competitive*. The number to be certified shall be not less than three; however, if more than one vacancy is to be filled, the name of one additional eligible for each vacancy may be certified. Each commission shall adopt rules for the method of certifying persons eligible for appointment, promotion, reemployment, and reinstatement and shall provide for appointments defined as emergency and temporary appointments if certification is not required.[135]

---

[131] *Firefighters II*, 590 So. 2d at 1176 n.6.
[132] *Achord*, slip op. at 10.
[133] R. Doc. 38 at ¶ E(10).
[134] R. Doc. 54-1 at 7-10, 12.
[135] La. Const. art. X, § 7 (emphasis added).

The City argues that, by its text, Article X, Section 7's merit-based requirement applies only to "certification by the appropriate department of civil service," not the Appointing Authority's subsequent process of evaluating candidates who have been so certified.[136] The Court has found no court case directly addressing whether Article X, Section 7's merit-based requirement applies to an Appointing Authority's process of evaluating candidates who have been certified by a civil service department as eligible for promotion.[137] However, the Court need not decide the issue because, assuming Section 7 does apply to an Appointing Authority like the City, the factors in CAO Policy Memorandum 143(R) are entirely merit-based.[138]

Louisiana courts have not clearly defined "merit-based." One court has stated, in passing, that merit is "relevant, job-related service."[139] Individual decisions have helped define the meaning of merit in holding certain criteria are merit-based and certain criteria

---

[136] R. Doc. 45-1 at 7-10.

[137] Some authority would suggest Section 7 does not apply to an Appointing Authority. As stated, by its terms, Section 7's merit requirement seems to apply only to "certification by the appropriate department of civil service." *See* La. Const. art. X, § 7. Moreover, as explained in the previous section, the Appointing Authority traditionally has wide discretion in choosing among candidates certified as eligible. *See supra* notes 114-116 and accompanying text. *Lawson* and *PANO II*, discussed above, may suggest there are distinctions between the factors the civil service department may consider versus what the Appointing Authority may consider. *See Lawson*, 618 So. 2d at 1005 (emphasis added) (rejecting the employee's argument that the Appointing Authority failed to consider his length of service in denying a promotion because "length of service is one of the elements to be used by the *appropriate civil service department in compiling the certificates of eligibility* [under Article X, Section 7]" and "[t]he appointing authority's discretion in making the appointment is not limited by the constitutional provision because length of service has received proper consideration"); *PANO II*, 94-1078, at p. 7, 649 So. 2d at 959 (emphasis added) (explaining that "Article X, Section 7 merely sets out the criteria to be used, and grants the Civil Service Commission the power to devise the method by which, employees are *certified as eligible for appointment or promotion*" and holding the City's residence requirement did "not impinge upon these methods and criteria set out in Section 7 for determining those *eligible for promotion*," but "merely require[d] that prior to *acceptance of the promotion and appointment* to the new position, the eligible employee must establish his domicile in Orleans Parish"). On the other hand, the Commission in *Achord* held that the merit requirement of Section 7 applies to an Appointing Authority. *Achord*, slip op. at 27 ("The Commission finds that NOFD failed to adhere to the requirements of Article X, Section 7 of the Louisiana Constitution when it implemented a promotional scheme that was not merit-based or competitive."). That portion of the Commission's holding was not appealed to the Louisiana Fourth Circuit.

[138] Thus, the Court need not address the Commission's argument that Article X, Section 7's merit requirement applies to the City either.

[139] *Gandy v. State Civil Serv. Comm'n*, 498 So. 2d 765, 769 (La. Ct. App. 1st Cir. 1986).

are non-merit-based.[140] In *Maurice v. Department of Police*, the Louisiana Fourth Circuit invalidated a promotion on the basis of a non-merit factor, namely "political favoritism."[141] In that case, the superintendent suspended the usual promotional rules because "he felt he should not be restricted by Civil Service rules where he personally knows the officer he would like to promote."[142] The Court reasoned that when the predetermined candidate "failed to meet the [objective] criteria, the Superintendent sought to have the rules suspended so that he might appoint 'appropriately qualified personnel,' which was merely a euphemism for favoritism."[143]

In *Ramirez v. Department of Social Services* (*Ramirez I*), the Louisiana First Circuit held that a claim of pay discrimination for consideration of a non-merit factor should not have been dismissed when the alleged non-merit factor was possession a master's degree.[144] The court "question[ed] the . . . premise that educational attainment is in all cases a merit factor consideration, especially where, as here, various substitutions are allowed in each class to satisfy the stated minimum qualifications; substitution options allegedly waived the need for a master's degree; and where the advantaged and disadvantaged employees allegedly perform identical tasks."[145] After another appeal following a decision on the merits, the Louisiana First Circuit in *Ramirez v. Department*

---

[140] As stated, the Court has found no court decision explicitly applying the merit requirements in Article X, Section 7 to Appointing Authorities. Rather, the cases the Court discusses generally determined whether the Appointing Authority "discriminated" against an employee—a different allegation of wrongdoing. *See* La. Const. art. X, § 8(B). Some versions of the civil service rules included non-merit factors in the definition of discrimination.

[141] *Maurice v. Dep't of Police*, 94-2368, p. 7 (La. App. 4 Cir. 6/7/95), 657 So. 2d 501, 506.

[142] *Id.* at pp. 6-7, 657 So. 2d at 505.

[143] *Id.* at p. 7, 657 So. 2d at 505. The reverse is also true. "Personal animosity of an immediate supervisor is clearly a non-merit factor." *Bell v. Dep't of Health & Hum. Res.*, 483 So. 2d 945, 953 (La. 1986) (Dennis, J., dissenting).

[144] *Ramirez v. Dep't of Soc. Servs.* (*Ramirez I*), 603 So. 2d 795, 800 (La. Act. App. 1st Cir. 1992).

[145] *Id.*

*of Social Services* (*Ramirez II*), held possession of a master's degree was a merit factor.[146] The court reasoned "[a] college degree is objective evidence of a given amount of educational experience and attainment," and while "possession of a degree does not always result in a person bringing more skills to the job at hand than the person who does not possess a degree," the court found "advanced education enhances the attributes of employees in a civil service classification and thus forms a rational basis for differentiation between employees."[147]

In *Marcantel v. Department of Transportation and Development*, the Louisiana First Circuit held that a promotion was based on a non-merit factor when it was done "solely in order to facilitate the settlement of a suit" which was filed by the chosen candidate against the Appointing Authority.[148] In *Mixon v. New Orleans Police Department*, the Louisiana Fourth Circuit held consideration of age was a non-merit factor.[149] In *Walker v. Department of Public Works Sewerage*, the Louisiana Fifth Circuit Court of Appeal held collection of worker's compensation benefits was a non-merit factor.[150] In *Cilano v. Department of Employment Security*, the Louisiana First Circuit found an employee who was discharged based on his "job performance" and his "substandard work" was not discharged due to non-merit factors.[151]

Especially relevant to this case, in *Achord*, the Commission itself examined fifteen factors NOFD adopted to evaluate candidates for promotion certified by the Commission, and held that, while these factors were applied in a non-merit manner, they were all

---

[146] *Ramirez v. Dep't of Soc. Servs.* (*Ramirez II*), 96-1448, pp. 6-7 (La. App. 1 Cir. 5/9/97), 694 So. 2d 1157, 1161-62 (citing *Latona v. Dep't of State Civ. Serv.*, 492 So.2d 27 (La.App. 1st Cir. 1986)).
[147] *Id.*
[148] *Marcantel v. Dep't of Transp. & Dev.*, 590 So. 2d 1253, 1256-57 (La. Ct. App. 1st Cir. 1991).
[149] *Mixon v. New Orleans Police Dep't*, 407 So. 2d 793, 795 (La. Ct. App. 4th Cir. 1981).
[150] *Walker v. Dep't of Pub. Works Sewerage*, 549 So. 2d 426, 428 (La. Ct. App. 5th Cir. 1989).
[151] *Cilano v. Dep't of Emp. Sec.*, 356 So. 2d 458, 460 (La. Ct. App. 1st Cir. 1977).

facially merit-based.[152] In that case, NOFD adopted a procedure by which a promotional committee would interview candidates certified for promotion and evaluate them based on fifteen factors: 1) Effective application of department's safety and accountability procedures, and initiatives; 2) Support for and effective implementation of the department's fire prevention strategies and initiatives; 3) Performance history; 4) Disciplinary history; 5) Education; 6) Resume; 7) Training; 8) Demonstrated leadership; 9) Interpersonal skills; 10) Problem-solving skills; 11) Years of service; 12) Civil Service examination score; 13) Commendations, awards, recognition and accomplishments; 14) Relevant experience; and 15) Additional relevant considerations, including any additional materials the candidates may wish to submit.[153] However, not every candidate was invited to an interview, and NOFD kept no records of how the factors were measured or the reasons why one candidate was chosen over another.[154] Addressing NOFD's fifteen factors, the Commission stated "NOFD did identify difficult-to-measure factors that, on their face, were merit-based and relevant to a Fire Captain's ability to succeed."[155] Some factors were "objective," including "years of service, test score, disciplinary history, performance history," and some factors were more "subjective," including "demonstrated leadership, problem-solving skills, effective implementation of the department's fire prevention strategies and initiatives."[156] The Commission did not find using these more subjective factors improper *per se*.[157] In fact, the Commission noted subjective criteria have been used in some form for years, including in conducting the civil service

---

[152] *Achord*, slip op. at 19-23, 27-29. That portion of the Commission's holding was not appealed to the Louisiana Fourth Circuit.
[153] *Id*. at 14-15.
[154] *Id*. at 19-23, 27-29.
[155] *Id*. at 20-21.
[156] *Id*. at 21.
[157] *See id*.

examination, and "[m]aking a promotional decision based upon factors such as relevant training, experience, demonstrated leadership and successful implementation of departmental initiatives benefits both the department and the community at large."[158]

However, the Commission in *Achord* took issue with NOFD's recordkeeping of how it selected candidates: "NOFD . . . did not combine discretion with documentation or transparency. By combining objective and subjective factors without providing any defined values or measurements, NOFD could not establish that the 2016 Fire Captain promotions were 'competitive' and 'merit-based.'"[159] NOFD "did not provide any insight on how it made the decision to interview some candidates and not others," and NOFD could not show it had a "structured interview process" because it refused to provide the questions used in the interview.[160] Ultimately, NOFD could not "articulate the reason why one candidate was hired or promoted over another," and thus applicants could not "have adequate notice of the factors upon which [NOFD] [would] rely in making hiring and promotional decisions."[161]

In this case, the Court finds the criteria and procedure laid out in CAO Policy Memorandum 143(R) to be merit-based. The first factor is performance evaluations.[162] Plaintiffs allege performance evaluations "are strictly subjective in nature, and can be manipulated in either direction depending on the whims of the evaluator."[163] However, the Commission in *Achord* specifically found "performance history" to be "objective" and facially "merit-based."[164] Moreover, in *Cilano*, the court found "job performance" and

---

[158] *Id.* at 21 & n.2.
[159] *Id.* at 21.
[160] *Id.* at 22.
[161] *Id.* at 27.
[162] R. Doc. 38 at ¶ E(5); R. Doc. 1-2 at 11.
[163] R. Doc. 38 at ¶ E(5).
[164] *Achord*, slip op. at 21.

"substandard work" to be merit factors.[165] Even if performance evaluations were partially subjective, the Commission in *Achord* found inclusion of some subjective criteria to be appropriate.[166] Beyond the conclusory allegation that performance evaluations are subjective and prone to manipulation, Plaintiffs have alleged no facts to plausibly show performance evaluations violate Article X, Section 7 of the Louisiana Constitution because they are non-merit-based.

The second factor is disciplinary history.[167] Plaintiffs allege disciplinary history "may be biased and/or inaccurate" and NOPD's records concerning disciplinary history are "lacking."[168] However, the Commission in *Achord* specifically found "disciplinary history" to be "objective" and facially "merit-based."[169] This factor is again similar to the "job performance" and "substandard work" found to be merit factors in *Cilano*.[170] Plaintiff's conclusory allegations that disciplinary history may be biased and subject to a "lacking" recordkeeping system are insufficient to plausibly state a claim that disciplinary history violates Article X, Section 7 of the Louisiana Constitution as being non-merit-based. As addressed below, the issues with recordkeeping the Commission found in *Achord* are not present in this case.

The third factor is job history.[171] Plaintiffs allege "[a]n individual's job history is derived from many factors, including position and assignment as well as schools attended," which are "strictly up to NOPD."[172] However, the Commission in *Achord* addressed several related factors. It found "years of service" to be "objective" and facially

---

[165] *Cilano*, 356 So. 2d at 460.
[166] *Achord*, slip op. at 21.
[167] R. Doc. 38 at ¶ E(5); R. Doc. 1-2 at 11.
[168] R. Doc. 38 at ¶ E(5).
[169] *Achord*, slip op. at 21.
[170] *Cilano*, 356 So. 2d at 460.
[171] R. Doc. 38 at ¶ E(5); R. Doc. 1-2 at 11.
[172] R. Doc. 38 at ¶ E(5).

"merit-based," and it found other factors such "education," "resume," and "training" to be facially merit-based.[173] In addition, the court in *Ramirez II* found education such as a master's degree to be a merit factor because "advanced education enhances the attributes of employees in a civil service classification and thus forms a rational basis for differentiation between employees."[174] Plaintiff's conclusory allegations that disciplinary history may be manipulated by NOPD are insufficient to plausibly state a claim that job history is non-merit-based.

Finally, a review of the system outlined in CAO Policy Memorandum 143(R) does not reveal any issues with documentation or transparency. The Composite Score is based on clearly defined values.  The applicant's ranking on the civil service examination is converted to a score out of 100 with a publicly available formula.[175] The Appointing Authority averages the ratings from the Promotion Committee and awards points out of 100 based on the following rubric: High (H) equals 100 points, Medium (M) equals 50 points, and Low (L) equals 0 points.[176] After adding the Civil Service examination score and the Promotion Committee scores, the "applicant with the highest Composite Score must be selected for promotion to fill the vacant position."[177]

There is also a clear record documenting the Promotion Committee's scores.  The Promotion Committee conducts a "holistic review of each applicant's merit and fitness for promotion to the vacant position" as demonstrated by three components: performance evaluations, disciplinary history, and job history.[178] Based upon this evaluation, the Promotion Committee rates each applicant in one of three ways: High (H), meaning the

---

[173] *See Achord*, slip op. at 14, 21.
[174] *Ramirez II*, 96-1448, at pp. 6-7, 694 So. 2d 1157, 1161-62.
[175] R. Doc. 1-2 at 12-13; R. Doc. 38 at ¶ E(4).
[176] *Id.* at 12-13; R. Doc. 38 at ¶ E(4).
[177] R. Doc. 1-2 at 12.
[178] R. Doc. 1-2 at 11; R. Doc. 38 at ¶ E(4).

"Applicant is recommended for immediate promotion;" Medium (M), meaning the "Applicant is acceptable for immediate promotion;" and Low (L), meaning the "Applicant is not recommended for immediate promotion."[179] The Promotion Committee "must provide a written explanation that clearly describes the reason(s) for this rating, including specific information that supports the rating," and the Appointing Authority must maintain all records "considered or created by the Promotion Committee" for any period required by law and in a way that allows "them to be readily produced and reviewed by the applicant."[180]

Thus, Plaintiffs' allegations do not show the sort of paperless and arbitrary process the Commission took issue with in *Achord*.[181] Moreover, unlike in *Maurice*, in which the superintendent suspended the regular promotion process to choose his favorite candidate without considering objective criteria,[182] in this case the City has adopted a publicly available procedure with clear procedures and criteria.

For these reasons, the process adopted in CAO Policy Memorandum 143(R) is merit-based.[183]

---

[179] R. Doc. 1-2 at 11.

[180] *Id.* at 12. In their opposition, Plaintiffs argue NOPD has not yet provided the reasons for their scores. R. Doc. 47 at 8. However, Plaintiffs include no such allegations in their Amended Complaint. *See* R. Doc. 38.

[181] *See Achord*, slip op. at 19-23, 27-29.

[182] *Maurice*, 94-2368, at p. 7, 657 So. 2d 501, 505.

[183] The City also argues that, even if the criteria and procedure in CAO Policy Memorandum 143(R) are not merit-based, the Consent Decree requires their adoption and preempts state law. R. Doc. 45-1 at 12-15; *see Police Ass'n of New Orleans ex rel. Cannatella v. City of New Orleans*, 100 F.3d 1159, 1169 (5th Cir. 1996); *Perschall v. Louisiana*, 96-0322, pp. 26-28, 30 (La. 7/1/97), 697 So. 2d 240, 258-60; *Tucker v. City of Charleston*, 946 F.2d 887 (4th Cir. 1991), 1991 WL 211892, at *3 (unpublished). In their Amended Complaint, Plaintiffs argue the Consent Decree does not preclude an injunction against the enforcement of CAO Policy Memorandum 143(R) because the factors listed in CAO Policy Memorandum 143(R) are not the same as the eight factors Paragraph 303 of the Consent Decree directs NOPD to implement in its promotional process. R. Doc. 38 at ¶ 13. The Court notes Paragraph 303 of the Consent Decree concerns only whether applicants are "eligible" for promotion. No. 12-1924, R. Doc. 564 at ¶ 303. Moreover, Chapter 34.2 of the NOPD Operations Manual repeats all eight factors from the Consent Decree in Paragraph 30, along with three additional factors, for a total of eleven. These three additional factors in Paragraph 30 are related to and simply expand upon the eight factors in the Consent Decree. In any event, because the Court finds CAO Policy Memorandum 143(R) is merit-based, the Court need not address either the City's or Plaintiffs' arguments in this regard.

### V. The Court Will Not Allow Plaintiffs to Amend Their Complaint a Third Time.

Plaintiffs have not requested leave to amend, and even if they did, the Court will not allow Plaintiffs to file a third amended complaint. Federal Rule of Civil Procedure 15(a) provides the Court should grant leave to amend freely when justice so requires.[184] Leave to amend is not "automatic," but the Court must possess a "substantial reason" to deny leave to amend.[185] A court possesses a "substantial reason" when, for instance, a plaintiff has acted with "undue delay, bad faith or dilatory motive" in seeking leave to amend, the plaintiff has made "repeated failures to cure deficiencies by amendments previously allowed," "undue prejudice [will result] to the opposing party by virtue of allowance of the amendment," or the amendment would be completely futile.[186]

In this case, the Court previously granted Plaintiffs leave to amend their complaint in response to the first motions to dismiss filed by the City and the Commission,[187] yet Plaintiffs have failed to cure the deficiencies in their allegations. The allegations in Plaintiffs' Amended Complaint, even if accepted as true, do not state a claim against the City or the Commission. Plaintiffs' failure to correct the deficiencies in their complaint by the amendment previously allowed convinces the Court it should deny the right to further amend.

For the reasons explained above, Plaintiffs are not entitled to declaratory relief that the City has violated the laws and constitution of the State of Louisiana and the Consent Decree or to an injunction against the City's application of CAO Policy Memorandum 143(R).

---

[184] Fed. R. Civ. P. 15(a).
[185] *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005).
[186] *Id.*
[187] R. Doc. 43.

## <u>CONCLUSION</u>

**IT IS ORDERED** that the motion to dismiss filed by Defendant the City of New Orleans[188] is **GRANTED**. Plaintiffs' claims for declaratory relief and an injunction against the City are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by the City of New Orleans Civil Service Commission[189] is **GRANTED**. Plaintiffs' claims against the Commission are **DISMISSED WITH PREJUDICE**.

**New Orleans, Louisiana, this 22nd day of July, 2022.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[188] R. Doc. 45.
[189] R. Doc. 44.